# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| K-Mart Corporation, | ) | No. 02 B 02474 |
| | ) | Chicago, Illinois |
| | ) | 11:00 a.m. |
| Debtor.) | | January 25, 2006 |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE SUSAN PIERSON SONDERBY

APPEARANCES:

For the Debtor:          Mr. Patrick W. McCarthy;
                         Mr. William J. Barrett;

For Floorgraphics:       Mr. Michael Yetnikoff;

Court Reporter:          Jerri Estelle, CSR, RPR
                         U.S. Courthouse
                         219 South Dearborn
                         Room 661
                         Chicago, IL  60604.

2

1    THE CLERK:  K-Mart Corporation, 02 B

2  2474.

3    MR. MC CARTHY:  Good morning, Your

4  Honor, Patrick McCarthy from Howard & Howard on

5  behalf of the debtor, K-Mart Corporation.

6    MR. BARRETT:  Your Honor, William

7  Barret for K-Mart Corporation.

8    MR. YETNIKOFF:  Good morning, Your

9  Honor.  Michael Yetnikoff on behalf of Floorgraphics.

10    THE COURT:  I'm going to read my oral

11  ruling into the record, so you may be seated and take

12  notes if you so desire.

13    This comes before the Court on the

14  motion of K-Mart Corp. for summary judgment or for an

15  order in limine regarding damages with respect to

16  K-Mart's objection to the claim of Floorgraphics,

17  Inc.

18    This matter comes to be heard on the

19  motion of K-Mart Corporation for summary judgment or

20  for order in limine regarding damages with respect to

21  K-Mart's objection to claim of Floorgraphics, Inc.

22    The Court notes that on March 22nd,

23  2002, it entered a confidentiality agreement and

24  protective order providing inter alia that either

25  party could designate confidential information to be

3

1  protected from disclosure.  Only the reply memorandum
2  filed by K-Mart in support of this motion was filed
3  as a restricted document.  The following ruling does
4  not contain facts exclusively contained in the reply.
5        Unless otherwise indicated, the
6  following facts are not in dispute.  At pertinent
7  times hereto, K-Mart Corporation was a Michigan
8  corporation operating hundreds of retail stores
9  across the country; Floorgraphics, Inc., is a
10  Pennsylvania corporation in the business of in-store
11  advertising which involves, inter alia, the placement
12  of pressure sensitive advertising decals on the
13  floors of retail stores.
14        Prior to the petition date,
15  Floorgraphics and K-Mart entered into a retail
16  advertising license agreement dated and, pursuant to
17  its terms, executed as of March 18th, 1998.
18        K-Mart agreed to participate in
19  Floorgraphics' floor decal program at certain
20  specified K-Mart stores.  The program involved
21  Floorgraphics entering into separate contracts with
22  advertisers who paid Floorgraphics' advertising fees.
23  In exchange for allowing Floorgraphics access to the
24  stores to affix the decals on the floors, K-Mart was
25  to receive from Floorgraphics the greater of a

4

1   specified percentage of Floorgraphics' collective

2   gross advertising fees, or a certain guaranteed

3   minimum payment.  During the term of the agreement,

4   K-Mart permitted Floorgraphics to, quote, furnish and

5   install, at Floorgraphics' expense, end of quote, up

6   to 30 decals per store, per month.

7           The agreement, which was signed by

8   Gary Ruffing, K-Mart's then vice president of

9   merchandise presentation, had a two-year term ending

10  on March 17th, 2000.  Section 3(D) of the agreement

11  is entitled, quote, Contract Renewal, end of quote,

12  and provides in part, quote, Floorgraphics and K-Mart

13  agree to provide for extension of the contract term

14  through a procedure of annual contract renewal.

15          Nine months prior to the contract

16  expiration of term, as amended by the original term

17  or the current term created by the most recent

18  contract renewal, Floorgraphics and K-Mart will meet

19  and decide whether to renew the contract.

20          Contract renewal extends the term of

21  the correct for one additional year, added at the end

22  of the existing contract term.

23          In no event is this procedure of

24  contract renewal to be construed on behalf of either

25  Floorgraphics or K-Mart to create a right of

5

1 automatic contract renewal, end of quote.

2        Two days after the execution of the

3 agreement, George Rebh of Floorgraphics sent Ken

4 Kramer, a K-Mart divisional vice president, a

5 memorandum indicating Floorgraphics' pleasure in

6 concluding the, quote, agreement to create a floor

7 advertising program in K-Mart, end of quote.

8        Rebh accounted in the memo that during

9 the parties' final negotiations, K-Mart requested and

10 received an increase in the amount of Floorgraphics'

11 guaranteed minimum payment.  Rebh advised that the

12 increase, quote, will produce losses, end of quote,

13 for Floorgraphics.

14        In consideration of those risks,

15 Floorgraphics asked during the contract negotiations

16 that K-Mart provide for an automatic annual renewal

17 of the agreement.  Rebh stated that K-Mart, quote,

18 could not agree to an automatic renewal, and K-Mart

19 inserted the final language of the renewal procedure

20 in the agreement, end of quote.

21        Apparently, Floorgraphics' investors

22 were not pleased and, according to Rebh, requested,

23 quote, a letter from our program supervisor

24 reflecting K-Mart and Floorgraphics' final

25 discussions on conditions for contract extensions,

6

1   end of quote.

2            Rebh's memorandum continues, stating,

3   quote, what you and I agreed was that if

4   Floorgraphics made the required payments, was not in

5   default of the agreement, and K-Mart wanted to

6   continue with floor advertising, our contract would

7   be renewed annually, end of quote.

8            Finally, Rebh asked Kramer for, quote,

9   a letter from Kramer for Rebh's acknowledgment which

10   recounts our final discussions that upon expiration

11   of the term or succeeding terms, if we are not in

12   default of our agreement and if K-Mart elects to

13   continue with floor advertising, our agreement will

14   be extended by K-Mart, end of quote.

15            Kramer responded to Rebh's memorandum

16   with a letter dated March 24th, 1998, which the

17   Court will refer to as the Kramer Letter.  The Kramer

18   Letter states in part, quote, the agreement calls for

19   a meeting between K-Mart and Floorgraphics to discuss

20   whether to renew the contract.

21            We were not able to include your

22   language for automatic renewal because K-Mart may

23   decide not to continue with floor advertising in the

24   future.  However, I have reviewed with Gary Ruffing

25   our discussions on this point, and our agreement is

7

1  that if Floorgraphics is not in default of the

2  contract and we want to continue to have floor

3  advertising in our stores, we will extend your

4  contract year to year and not do floor advertising

5  with someone else.

6          You can tell your investors that if

7  you are doing the job and we want floor advertising,

8  we will extend the contract, end of quote.

9          Rebh handwrote, quote, Thank you, Ken,

10 end of quote, and signed the bottom of the Kramer

11 letter on March 27th, 1998.

12          According to the declaration attached

13 to Floorgraphics' proof of claim, Kramer stated that

14 during the negotiation of the agreement,

15 Floorgraphics requested that the automatic renewal

16 provision be included in the agreement.

17          Kramer noted that, quote, I told

18 Floorgraphics that on the condition that Kramer,

19 indeed, wanted to continue to have the floor

20 advertising in their stores and if Floorgraphics was

21 not in default of the agreement, that K-Mart would

22 extend the agreement on an exclusive basis on a

23 year-to-year basis.

24          This renewal procedure then was

25 incorporated into the agreement so that although not

8

1   automatic, renewal would occur subject only to two

2   conditions.  I reiterated this agreement for renewal

3   in the Kramer letter, end of quote.

4              The obligation to renew the agreement

5   if Floorgraphics was not in default and K-Mart wanted

6   a floor advertising program, however, did not make it

7   into the express text of the final version of the

8   agreement.

9              On March 20th, 2000, the parties

10  executed a first addendum to the agreement.  The

11  addendum stated that the agreement expires on

12  March 17th, 2000.  It was executed, quote, in

13  consideration of the mutual covenants, provinces, and

14  agreements contained in the agreement, end of quote,

15  and established a one-year term.  The addendum does

16  not mention the conditions for extension discussed in

17  the Kramer Letter.

18             In August of 2000, the parties

19  executed the second and last addendum to extend the

20  term another year to March 17th, 2002, with a

21  different license fee but keeping all other terms of

22  the agreement the same.

23             The second addendum stated that the

24  agreement expired on March 17th, 2001.  And that,

25  quote, the agreement provides for an extension in

9

1  Section 3(D), end of quote.  The second addendum
2  makes no mention of the Kramer Letter.
3          Floorgraphics alleges that in July
4  2001, K-Mart breached the agreement by not meeting
5  with Floorgraphics to discuss contract renewal and by
6  signing a floor advertising agreement with News
7  America Marketing In-Store Services, Inc., referred
8  to as NAMIS.
9          Floorgraphics also alleges that K-Mart
10 breached by violating the confidentiality provisions
11 of the agreement when K-Mart disclosed its terms to
12 NAMIS.  K-Mart contends, however, that these
13 allegations relating to NAMIS were immaterial to
14 resolution of this motion.  The parties agree that
15 Floorgraphics was allowed access to the stores to
16 affix decals up until June 18th, 2002.
17          K-Mart filed a petition for
18 reorganization under Chapter 11 of the Bankruptcy
19 Code on January 22nd, 2002.  On August 14th,
20 2002, the Court approved K-Kart's rejection of the
21 agreement, thereby triggering a breach of that
22 contract as of January 21, 2002.
23          Floorgraphics filed proof of claim
24 number 42242, asserting an unsecured non-priority
25 claim in the amount of $59 million, based on damages

1   for the breach of the agreement.  K-Mart filed an

2   objection to the Floorgraphics claim.

3           K-Mart brought this motion for summary

4   judgment and/or motion in limine regarding damages in

5   connection with the claim objection.

6           In order to defeat a summary judgment

7   motion, the nonmovant, quote, must present definite,

8   competent evidence in rebuttal, end of quote.  Citing

9   Salvadori versus Franklin School District, 293 F.3d,

10  989.

11          Accordingly, quote, conclusory

12  statements in affidavits opposing a motion for

13  summary judgment are not sufficient to raise a

14  genuine issue of material fact, end of quote.  Citing

15  First Commodity Traders, Inc., versus Heinold

16  Commodities, Inc., 766 F.2d, 1007.

17          In short, summary judgment is the,

18  quote, put-up-or-shut-up moment in a lawsuit when a

19  party must show what evidence it has that would

20  convince a trier of fact to accept its version of the

21  event, end of quote.  Hammel versus Eau Galle Cheese

22  Factory, 407 F.3d 852.

23          Quote, in determining whether a

24  genuine issues exists, the court must view the

25  evidence presented through the prism of the

11

1  substantive evidentiary burden, end of quote.  Citing

2  Zarecki versus National Railroad Passenger Corp., 914

3  F.Supp 1566; citing Anderson versus Liberty Lobby,

4  Inc., 477 U.S. 242.

5        The substantive law at issue here

6  involves the determination and allowance of a claim

7  pursuant to Section 502 of the Bankruptcy Code.

8  Section 502(b) of the Code provides that when an

9  objection to a claim is made, the court shall

10  determine the amount of the claim and allow the claim

11  in that amount, subject to certain exceptions not

12  applicable here.  11 USC Section 502(b).  A claim

13  arising from the rejection of an executory contract

14  is determined and allowed under Section 502(b),

15  quote, the same as if such claim had arisen before

16  the date of the filing of the petition, end of quote.

17  11 USC, Section 502(g).

18        Quote, creditor entitlements in

19  bankruptcy arise in the first instance from the

20  underlying substantive law creating the debtor's

21  obligations, subject to any qualifying or contrary

22  provisions of the Bankruptcy Code, end of quote.

23  Citing Raleigh versus Illinois Department of Revenue,

24  530 U.S. 15.

25        The parties here agree that Michigan

12

1  law governs the determination of the amount of

2  Floorgraphics' claim.  Floorgraphics contends that

3  the agreement was for the sale of goods, and,

4  therefore, the Uniform Commercial Code applies.

5          When determining the applicability of

6  the UCC, Michigan courts employ a, quote, predominant

7  factor, end of quote.  Citing Catalina Marketing

8  Sales Corp. versus Department of Treasury, 678 N.W.2d

9  619.

10        Relevant factors are the language of

11  the agreement and the circumstances surrounding its

12  execution.  See Higgins versus Lauritzen, 530 N.W.2d

13  171.

14        Here, the agreement makes no reference

15  to a sale of the decals.  Rather, Floorgraphics

16  furnished and installed the decals at its cost.  In

17  addition, Floorgraphics was responsible for the

18  maintenance and removal of the decals.  Floorgraphics

19  had sole discretion to determine where and how long

20  the decals were displayed.  The agreement expressly

21  referred to the relationship of the parties as,

22  quote, independent contractor, end of quote, and,

23  quote, client, end of quote.

24        Finally, Floorgraphics' description of

25  the agreement and its proof of claim is counter to

13

1  the conclusory statements in Mr. Rebh's affidavit

2  that the agreement is for the sale of goods.  The

3  Court concludes that the UCC does not apply to the

4  determination of damages in this matter.

5        Under Michigan general contract law,

6  quote, damages recoverable for breach of contract are

7  those that arise naturally from the breach or those

8  that are in contemplation of the parties at the time

9  the contract was made.

10       Application of this principle in the

11  commercial contract situation generally results in a

12  limitation of damages to the monetary value of the

13  contract had the breaching party fully performed

14  under it, end of quote.  Kewin versus Massachusetts

15  Mutual Life Insurance Company, 295 N.W.2d 50.

16       To arrive at the amount of damages,

17  the Court references the terms of the subject

18  contract, ibid 54.  Here there's a dispute over the

19  provision of the agreement concerning its length.

20  K-Mart argues that the agreement extended by its

21  terms on March 17th, 2002, and the efforts to

22  introduce the Kramer Letter to establish otherwise

23  fails by application of the parol evidence rule.

24       Michigan's version of the parol

25  evidence rule prohibits courts from using parol

14

1  evidence to contradict the terms of a written

2  contract intended to be the final and complete

3  expression of the parties' agreement.  Citing

4  Wonderland Shopping Center Venture LP versus CDC

5  Mortgage Capital, Inc., 274 F.3d 1085.

6          When there is an integration clause

7  included in a contract, the clause conclusively

8  establishes that the parties intended that contract

9  to be the complete expression of their agreement.

10  Id.  Quote, where parties to an agreement have

11  entered into a written contract covering a particular

12  subject matter, all prior negotiations pertaining to

13  that subject have merged in the written agreement,

14  and parol evidence is inadmissible to show that the

15  contract does not conform with verbal agreements made

16  prior to its execution, end of quote.  Citing Vickers

17  versus American Oil Company, 182 N.W.2d.

18          It is presumed that all preceding

19  conversations are merged into the written contract.

20  Citing Hank versus Lamb, 16 N.W.2d 671.

21          Under Michigan law, parol evidence is

22  admissible to determine the parties' intent if the

23  contract is, quote, obviously incomplete, end of

24  quote, on its face.  UAW-GM Human Resource Center

25  versus KSL Recreation Corp., 579 N.W.2d 411.

15

1          Evidence of subsequent modifications

2   or waivers of an integrated contract is also

3   admissible.   Quality Products and Concepts Company

4   versus Nagel Precision Inc., 666 N.W.2d., 251.   The

5   party who asserts that there has been a modification

6   bears the burden of proving it.   Rash versus National

7   Steel Corp., 177 N.W.2d 428.   A meeting of the minds

8   is necessary to modify the contract.   Port Huron

9   Educational Association MEA/NEA versus Port Huron

10  Area School District, 550 N.W.2d 228.   Whether the

11  minds met is judged by an objective standard.   Citing

12  Marlo Beauty Supply, Inc., versus Farmer's Insurance

13  Group of Companies, 575 N.W.2d 324.

14          Here, the agreement contains not one

15  but two clauses that can be characterized as merger

16  clauses.   See Sections 9 and 14 of the agreement.

17  The parties intended the agreement to be a complete

18  expression of their intent.

19          The contract renewal clause is

20  unambiguous and not so, quote, obviously incomplete,

21  end of quote, so as to require clarification.   The

22  clause required a meeting nine months prior to

23  expiration of the term of the agreement to, quote,

24  decide whether to renew the contract, end of quote.

25  It also set out the effect of their renewal, if the

16

1   parties agreed to one, on the monetary aspects of the

2   agreement.  Finally, it provided that neither party

3   should consider the contract renewal provision to be

4   a right to automatic renewal.

5          There's nothing in the agreement

6   requiring K-Mart to renew the agreement upon

7   satisfaction of certain conditions such as that found

8   in the Kramer Letter.  That is, if Floorgraphics is

9   not in default and K-Mart wants to continue with the

10  floor decal program, K-Mart must renew the agreement.

11         The fact that one or both of the

12  parties to the agreement may have thought that the

13  agreement provided for an automatic renewal is

14  irrelevant because, as written, the agreement does

15  not contain such a requirement.  See Zurich Insurance

16  Company versus CCR & Company, 576 N.W.2d 392, which

17  said, quote, it is beyond doubt that the actual

18  mental processes of the contracting parties are

19  wholly irrelevant to the construction of contractual

20  term.  Rather, the law presumes that the parties

21  understand the import of a written contract and had

22  the intention manifested by its terms, end of quote.

23         The Kramer Letter gives a summary

24  account of the pre-execution conversations and

25  negotiations which merged into the agreement.  The

17

1   letter is what Mr. Rebh asked it to be, quote, a

2   letter which recounts our final discussions, end of

3   quote.  To allow the Kramer Letter into evidence

4   would amount to an impermissible consideration of

5   contradictory parol evidence.

6          Moreover, the fact that the

7   reiteration of the antecedent negotiations was

8   written after the execution of the agreement is of no

9   moment.  Indeed, the Kramer Letter's fundamental

10  character as parol is not changed merely because the

11  summary of the precontract conversations was written

12  down after the agreement was executed.

13          In addition, the language of the

14  Kramer Letter does not leave the Court to conclude

15  that the parties intended to modify the agreement.

16  See Prophet Productions Limited versus Olympia

17  Entertainment, Inc., 2002 Westlaw 737866 at page two

18  and three, an unpublished opinion rejecting

19  modification argument because of absence of language

20  in the agreement, quote, stating that it is a

21  modification of the licensing agreement, end quote.

22          Moreover, Floorgraphics' submissions

23  do not introduce a factual issue on this point.

24  Because the Kramer Letter was not a modification, the

25  Court need not address whether consideration was

18

1   needed or given or whether it was superseded by

2   subsequent addenda.

3           Likewise, the Kramer Letter does not

4   amount to K-Mart's waiver of the integration clauses

5   or the provision that neither party should consider

6   the contract renewal procedure to give an automatic

7   right of renewal.  There is no factual issue on that

8   point as well.

9           Floorgraphics also urges the Court to

10  apply the doctrine of promissory estoppel.  Quote,

11  promissory estoppel arises in equity when, one, there

12  is a promise; two, that the promissor should

13  reasonably have expected to induce action of a

14  definite and substantial character on the part of

15  promisee; three, which, in fact, reasonably produced

16  on the part of promisee reliance or forbearance of

17  that nature; four, under circumstances such that the

18  promise must be enforced if an injustice is to be

19  avoided, end of quote.  Pinto versus General Motors

20  Corp., 1999 Westlaw 33327151 at page one.

21          The doctrine of promissory estoppel is

22  to be cautiously applied.  Citing Marrero versus

23  McDonnell Douglas Capital Corp., 505 N.W.2d, 275.  It

24  is applied only where the facts are unquestionable.

25  Barber versus SMH, (US) Inc., 509 N.W.2d 791, 797.

19

1    The doctrine is not designed to give a

2  party a second bite at the apple if it fails to

3  provide a breach of contract.  Citing General

4  Aviation, Inc., versus Cessna Aircraft Corp., 915

5  F.2d 1038 at 1042; ParaData Computer Networks, Inc.,

6  versus Telebit Corp., 830 F.Supp. 1001, which held

7  that granting summary judgment in favor of alleged

8  promisor, noting that any promises made by the

9  promissor should have been made a part of the

10  contract if the promisee hoped to rely on them.

11    When an express integrated contract

12  covers the subject matter of the alleged promise, it

13  is unreasonable as a matter of law to rely on a

14  promise.  Citing Pinto 1999 Westlaw 33327151 at page

15  two, noting that, quote, equity would not be served

16  by turning an otherwise unambiguous express contract

17  on its head and imposing upon the parties something

18  that is at odds with their express agreement, end of

19  quote.  See also Doty versus Cleannet of Greater

20  Michigan, Inc., 2003 Westlaw 22956401 at page four.

21    In this matter, the integrated

22  agreement expressly covers the length of its term and

23  the procedure to renew it.  As such, it would be

24  unreasonable for Floorgraphics, as a matter of law,

25  to a rely on a purported promise to renew the terms

20

1   set out in the Kramer Letter.

2           For the reasons stated, the Court will

3   grant K-Mart's request in limine to bar introduction

4   of the Kramer Letter.

5           K-Mart, however, is not entitled to

6   summary judgment on the amount of Floorgraphics'

7   claim.  There are factual issues to be determined

8   concerning the alleged pre-rejection breaches.  That

9   is, whether K-Mart breached the exclusivity and

10  confidentiality clauses in its dealings with NAMIS

11  and whether K-Mart failed to meet as called for in

12  the contract renewal procedure.  There are also

13  factual issues with respect to the amount of damages,

14  if any, caused by the purported breaches.

15          On this point, the Court notes that

16  K-Mart focuses on the breach arising from the

17  rejection and summarily discounts the alleged

18  prepetition breaches relating to the NAMIS situation

19  as being immaterial to the determination of the

20  amount of Floorgraphics' claim.  See page 14 of

21  K-Mart's motion.

22          Quote, accordingly, Floorgraphics can

23  prove no damages for the January 21, 2002, breach,

24  end of quote.  That position, however, ignores the

25  principle that, quote, if the contract is rejected,

21

1  the resulting damages, including any prepetition

2  breach, constitute general unsecured claims against

3  the estate, end of quote.  Citing In Re Venture

4  Resources, Inc., 137 F.3d 786; citing National Labor

5  Relations Board versus Bill Disco and Bill Disco, 465

6  U.S. 513.

7            In other words, the fact that the

8  contract is rejected under Section 365 of the

9  Bankruptcy Code does not erase the prepetition

10  breach.  In short, K-Mart has not established that it

11  is entitled to judgment as a matter of law on its

12  prima facie case for allowance of Floorgraphics'

13  claim in the sum of $0.

14            For the reasons stated, the motion of

15  K-Mart for summary judgment or for an order in limine

16  regarding damages is granted in part and denied in

17  part.

18            An order will be entered barring

19  introduction of the Kramer Letter to vary the terms

20  of the agreement or in support of a promissory

21  estoppel argument and denying summary judgment in

22  favor of K-Mart on the objection of Floorgraphics'

23  claim.

24            Would you give me a minute order,

25  please, for reasons cited on the record entering the

22

1  relief entered.

2          Can we set a trial on the objection of
3  the claim?

4          MR. MC CARTHY:  Your Honor, we have a
5  current scheduling order that's in place.  I don't
6  believe there was a trial date scheduled in that
7  order.

8          THE COURT:  What's the last date in
9  that order that something's going to happen?

10          MR. YETNIKOFF:  The agreed scheduling
11  order provides that lay discovery is to be concluded
12  by March 2nd, 2006; that expert witness depositions
13  are to be completed by June 30, 2006.

14          At this point, I believe we may,
15  either with K-Mart or alone, ask for some extension
16  of those dates after we confer with our client and
17  see where we stand.

18          THE COURT:  Is there a status date in
19  that order?

20          MR. MC CARTHY:  No, there is not, Your
21  Honor.

22          MR. YETNIKOFF:  Perhaps we can have a
23  short status date?

24          THE COURT:  So you want to confer at
25  this juncture and give a status date in the next

23

1  couple weeks?  Is that what you're suggesting?

2                 MR. MC CARTHY:  That would be fine

3  with us, Your Honor.

4                 THE COURT:  All right.  I'll set a

5  status on the objection to claim for March 14th.

6                 MR. BARRETT:  That will be at 10:30,

7  Your Honor?

8                 THE COURT:  That will be at 10:30 --

9  or should we set that on the omnibus date?

10                 MR. BARRETT:  Well, that's not until

11  April 11th, and I think the parties want to move

12  quickly.

13                 THE COURT:  All right.  That will be

14  fine.

15                 MR. YETNIKOFF:  Your Honor, will the

16  Court be providing a written opinion?

17                 THE COURT:  I will not.  You will have

18  to use the transcript.

19                 MR. YETNIKOFF:  Very well.  Thank you.

20                 THE COURT:  My workload is such that I

21  can't do it.

22                          (Which were all the proceedings had in
                            the above-entitled cause, January 25,
23                          2006, at 10:30 a.m.)

24  I, JERRI ESTELLE, CSR, RPR, DO HEREBY CERTIFY
    THAT THE FOREGOING IS A TRUE AND ACCURATE
25  TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
    ENTITLED CAUSE.