# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KMART CORPORATION,　　　　　　　　) 　No. 02 B 02474
　　　　　　　　　　　　　　　　　) 　Chicago, Illinois
　　　　　　　　　　　　　　　　　) 　2:00 p.m.
　　　　　　　　　　　　Debtor. 　) 　December 12, 2006

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE SUSAN PIERSON SONDERBY

APPEARANCES:

For the Debtors: 　　　　　　Ms. Kim Robinson;
　　　　　　　　　　　　　　Mr. James Geary;

For FLOORgraphics: 　　　　　Mr. Mark Fisher;
　　　　　　　　　　　　　　Mr. Michael Yetnikoff;

Appearing Telephonically:

For the Debtors: 　　　　　　Mr. Andrew Goldman;

Court Reporter: 　　　　　　Amy Doolin, CSR, RPR
　　　　　　　　　　　　　　U.S. Courthouse
　　　　　　　　　　　　　　219 South Dearborn
　　　　　　　　　　　　　　Room 661
　　　　　　　　　　　　　　Chicago, IL　60604.

2

1   THE CLERK:  Taking up the matter set
2   for oral ruling in Kmart, 02-2474.  Andy Goldman is
3   on the telephone.
4   THE COURT:  All right.  Could I get
5   the appearances of counsel in the courtroom first,
6   please.
7   MR. FISHER:  Good afternoon, Your
8   Honor.  Mark Fisher and Mike Yetnikoff on behalf of
9   FLOORgraphics.
10   MS. ROBINSON:  Good afternoon, Your
11   Honor.  Kim Robinson on behalf of Kmart.
12   MR. GEARY:  James Geary on behalf of
13   Kmart.
14   THE COURT:  And on the phone we have?
15   MR. GOLDMAN:  Andy Goldman on behalf
16   of Wilmer Hale on behalf of Kmart.
17   THE COURT:  Thank you.  All right.
18   The matters before the court are Kmart's motion in
19   limine and/or motion for dismissal of or summary
20   judgment on non-rejection claims of FLOORgraphics,
21   Inc., and FLOORgraphics' motion for reconsideration
22   of the January 25th, 2006, in limine ruling on
23   admissibility of the Kramer letter -- of the Kramer
24   letter.  Unless otherwise stated, the facts are
25   admitted and some of the matters discussed are taken

3

1  from the court's ruling on Kmart's prior summary

2  judgment motion to provide background for this

3  current motion.

4           Prior to the petition date

5  FLOORgraphics, Inc., and Kmart entered into a retail

6  advertising license agreement dated and pursuant to

7  its terms executed as of March 18, 1998.  Kmart

8  agreed to participate in FLOORgraphics' floor decal

9  program at certain specified Kmart stores.  The

10 program involved FLOORgraphics entering into separate

11 contracts with advertisers who paid FLOORgraphics'

12 advertising fees.

13           In exchange for allowing FLOORgraphics

14 access to the stores to affix the decals on the

15 floors, Kmart was to receive the greater of a

16 specified percentage of the FLOORgraphics' collected

17 gross advertising fees or certain guaranteed minimum

18 payments.  The agreement had a two-year term ending

19 on March 17th, 2000.  Section 3(d) of the agreement

20 is entitled "contract renewal", and provided in part

21 that nine months prior to expiration Kmart and

22 FLOORgraphics would meet and decide whether to renew

23 the agreement.

24           If they decided to, the agreement

25 would be extended for one year.  The parties agreed,

4

1   however, that nothing in the agreement would be

2   construed as providing for an automatic right of

3   renewal.   Two days after the execution of the

4   agreement, George Rebh of FLOORgraphics sent Ken

5   Kramer, a Kmart divisional vice-president, a

6   memorandum indicating FLOORgraphics' pleasure in

7   concluding the "agreement to create a floor

8   advertising program in Kmart."

9               Rebh recounted in the memo that during

10  the parties' final negotiations Kmart requested and

11  received an increase in the amount of FLOORgraphics'

12  guaranteed minimal payment.   Rebh advised that the

13  increase "will produce losses" for FLOORgraphics.   In

14  consideration of those risks, FLOORgraphics asks

15  during the contract negotiations that Kmart provide

16  for an automatic annual renewal of the agreement.

17  Rebh stated that Kmart "could not agree to an

18  automatic renewal and Kmart inserted the final

19  language of the renewal procedure in the agreement."

20              Apparently FLOORgraphics' investors

21  were not pleased, and according to Rebh, requested,

22  "a letter from our program supervisor reflecting

23  Kmart and FLOORgraphics' final discussions on

24  conditions for contract extensions."   Rebb's

25  memorandum continues stating, "What you and I agreed

5

1  was that if FLOORgraphics made the required payments,

2  was not in default of the agreement, and Kmart wanted

3  to continue with floor advertising, our contract

4  would be renewed annually."

5          Finally, Rebh asked Kramer for a,

6  "letter from Kramer for Rebb's acknowledgment which

7  recounts our final discussions that upon expiration

8  of the term or succeeding terms, if we are not in

9  default of our agreement, and if Kmart elects to

10 continue with floor advertising, our agreement will

11 be extended by Kmart."

12          Kramer responded to Rebh's memorandum

13 with a letter dated March 24th, 1998, which the court

14 will refer to as the Kramer letter.  The Kramer

15 letter states in part that, "The agreement calls for

16 a meeting between Kmart and FLOORgraphics to discuss

17 whether to renew the contract.  We are not able to

18 include your language for automatic renewal because

19 Kmart may decide not to continue with floor

20 advertising in the future.

21          "However, I have reviewed with Gary

22 Ruffing our discussions on this point, and our

23 agreement is that if FLOORgraphics is not in default

24 on the contract and we want to continue to have floor

25 advertising in our stores, we will extend your

6

1  contract year to year and not do floor advertising

2  with someone else.  You can tell your investors that

3  if you are doing the job, and we want floor

4  advertising, we will extend your contract." Rebh

5  handwrote, "Thank you, Ken," and signed the bottom of

6  the Kramer letter on March 27, 1998.

7           According to a declaration attached to

8  FLOORgraphics' proof of claim, Kramer stated that

9  during the negotiation of the agreement,

10 FLOORgraphics requested that the automatic renewal

11 provision be included in the agreement.  Kramer noted

12 that, "I told FLOORgraphics that on the condition

13 Kmart indeed wanted to continue to have floor

14 advertising in its stores, and if FLOORgraphics was

15 not in default of the agreement, then Kmart would

16 extend the agreement on an exclusive basis -- on an

17 exclusive basis; that is, a year-to-year basis.  This

18 renewal procedure then was incorporated into the

19 agreement so that although not automatic, renewal

20 would occur subject to only these two conditions.  I

21 reiterated this agreement for renewal in the Kramer

22 letter."

23           On March 20th, 2000, the parties

24 executed a first addendum to the agreement.  The

25 addendum stated that the agreement expires on March

7

1   17th, 2000, was executed "in consideration of mutual

2   covenants, promises and agreements contained in the

3   agreement," and established a one-year term.  The

4   addendum does not mention the conditions for

5   extension discussed in the Kramer letter.

6               In August of 2000, the parties

7   executed the second and last addendum to extend the

8   term another year, to March 17th, 2002, with a

9   different license fee but keeping all other terms of

10  the agreement the same.  The second addendum stated

11  that the agreement expired on March 17th, 2001, and

12  that, "The agreement provides for its extension in

13  Section 3(d)."  The second addendum makes no mention

14  of the Kramer letter.

15              Kmart filed a petition for

16  reorganization under Chapter 11 of the Bankruptcy

17  Code on January 22, 2002.  On March 8, 2002, Kmart

18  filed a motion to reject the agreement.  On July 31,

19  2002, prior to the court ruling on the rejection

20  motion, FLOORgraphics filed proof of claim number

21  42242 asserting an unsecured, nonpriority claim in

22  the amount of $59 million based on, "contract

23  rejection damages."

24              The addendum attached to the proof of

25  claim, with a copy of the agreement, explains, inter

8

1   alia, that subsequent to the agreement a dispute

2   arose between the parties regarding, among other

3   issues, the possibility of automatic renewal.

4   Further, FLOORgraphics estimated, with the assistance

5   of an expert, that it will incur $59 million in

6   damages if the agreement was rejected.  FLOORgraphics

7   reserved the right to amend the claim, "upon the

8   discovery of new or additional information related to

9   its claim."

10              On August 14, 2002, the court entered

11  an order approving Kmart's rejection of the

12  agreement.  Kmart filed an objection to the

13  FLOORgraphics claim.  Prior to the conclusion of

14  discovery or the setting of a discovery deadline,

15  Kmart filed a motion for summary judgment and/or

16  motion in limine with respect to the objection.  On

17  January 25th, 2006, the court ruled on the motion

18  barring introduction of the Kramer letter, noting,

19  inter alia, that the letter contained a reiteration

20  of precontract negotiations that merged into the

21  agreement.

22              The court denied Kmart's request for

23  summary judgment, however, because Kmart failed to

24  point out an absence of evidence to support

25  FLOORgraphics' case for damages based on breaches of

9

1  exclusivity, confidentiality and meeting clauses of

2  the agreement.  FLOORgraphics then filed a motion for

3  reconsideration of the in limine ruling on the

4  admissibility of the Kramer letter.  Kmart filed a

5  motion in limine and/or motion for dismissal of or

6  summary judgment on nonrejection claims.

7          The court subsequently entered a

8  minute order staying discovery until it ruled on the

9  pending motions.  The order also provided that

10  following the ruling the court will reset the

11  discovery cutoff.  The court will discuss

12  FLOORgraphics' motion to reconsider its in limine

13  ruling with respect to the Kramer letter first.

14          "An in limine ruling is merely

15  speculative in effect, completely dependent upon what

16  happens at trial."  Citing Wilson v. Williams, 182

17  F.3d 562, citing Luce v. U.S., 469 U.S. at 38 --

18  strike that.  469 U.S. 38, 41 and 42.  The court is,

19  "free in the exercise of sound judicial discretion to

20  alter a previous in limine ruling."  Id.  Indeed, the

21  court is free to alter an in limine ruling even if

22  nothing unexpected happens at trial.  Id.

23          Put another way, the conditional

24  ruling is reconsidered as events at trial warrant.

25  See Merk v. Jewel Food Stores, 1990 Westlaw 16281,

1  page 4.   In limine rulings excluding parol evidence

2  are subject to being altered.   See International

3  Paper Company v. Androscoggin Energy, LLC, 2004

4  Westlaw 887379, page 5.

5              Kmart concedes that even if its

6  summary judgment motion is entered an issue remains

7  as to the extent of FLOORgraphics' damages.  See

8  Kmart's motion, page 2, footnote 2.  The court will

9  defer ruling on FLOORgraphics' motion to alter the

10 court's previous in limine ruling to trial in order

11 to consider whether to alter the ruling "as events

12 unfold at trial."  See West Coast Video Enterprises,

13 Inc., v. Ponce de Leon, 1991 Westlaw 49566, page 1.

14              As noted, the court ruled on Kmart's

15 first motion for summary judgment that motion --

16 strike that -- that summary judgment was

17 inappropriate because Kmart failed to demonstrate

18 that there are no genuine issues of material fact as

19 to FLOORgraphics' case for damages based on breaches

20 of exclusivity, confidentiality and meeting

21 provisions of the agreement.

22              If those breaches occurred, the extent

23 of damages arising from them may be different than

24 the extent of damages occasioned by rejection of the

25 agreement which when approved by the court is

1   essentially a breach in the nature of an anticipatory

2   repudiation of the agreement.   See Central States

3   Southeast and Southwest Areas Pension Fund v. Basic

4   American Industries, Inc., 252 F.3d 911, 916, cert

5   denied at 534 U.S. 1079.

6           In an addendum to its proof of claim,

7   FLOORgraphics contends that the damages arising from

8   the rejection are the resultant "economic impact" on

9   FLOORgraphics estimated by an expert to be $59

10  million "based upon a number of criteria."  At oral

11  argument, FLOORgraphics' counsel explained that the

12  $59 million is the outside figure of FLOORgraphics'

13  lost profits.  Kmart contends that the estimation of

14  lost profit is based on a flawed understanding of the

15  length of the agreement.

16          FLOORgraphics, according to Kmart,

17  believes that the agreement continues as long as

18  Kmart utilizes floor decal advertising in its stores

19  from whatever source.  Kmart asserts that the

20  agreement ended by its terms on March 18, 2002.

21  Accordingly, damages caused by the rejection, if any,

22  are for the short period between the effective date

23  of the rejection, March 6, 2002, to the termination

24  of the agreement, March 18, 2002.

25          Without ruling on the point, Michigan

12

1   law concerning the extent of damages recoverable from

2   breaches of confidentiality or exclusivity clauses

3   may be different from those associated with

4   repudiation of the contract.  As such, the damages

5   may not be impacted by the date the agreement ends.

6           In its response to Kmart's current

7   motion, FLOORgraphics discusses this point.  See

8   pages 9 through 10 of FLOORgraphics' response wherein

9   it asserts, citing to Michigan law, that Kmart should

10  disgorge the benefit it received from sharing

11  confidential information which to FLOORgraphics

12  equals approximately $26 million.

13          Kmart did not argue in its first

14  summary judgment motion as to the merit of

15  FLOORgraphics' assertion of damages relating to

16  breaches of the exclusivity, confidentiality and

17  meeting provisions.  Kmart merely stated in its

18  response to FLOORgraphics' statement of additional

19  facts that facts relating to those breaches were

20  immaterial.  Kmart did not at that time state why it

21  thought the facts were immaterial.  The court did not

22  anticipate Kmart's present contention that

23  FLOORgraphics' proof of claim only asserted damages

24  based on rejection of the agreement.

25          Kmart argues in its present motion

13

1  that FLOORgraphics, now that the July 31, 2002, bar

2  date for filing claims has passed, should not be

3  allowed to assert damages based on a type of breach

4  not specifically raised in the original timely filed

5  proof of claim.

6         In response to that argument,

7  FLOORgraphics asks the court to allow it to amend its

8  proof of claim.  Rule 7015 of the Federal Rules of

9  Bankruptcy Procedure, which incorporates Rule 15 of

10  the Federal Rules of Civil Procedure, applies in the

11  context of a request to amend proof of claim.  Citing

12  in re Unroe, 937 F.2d 346 at 349.  "A creditor may

13  amend a claim after the bar date if it meets Federal

14  Rule of Civil Procedure 15(c)'s standard of arising

15  out of an untimely filed 'claims conduct transaction

16  or occurrence.'"  Id.

17         Bankruptcy Rule 7015, "Is not,

18  however, the only possible authority for amendment."

19  Another potential basis is the bankruptcy court's

20  broad equitable jurisdiction.  Id.  The factors

21  associated with the test of excusable neglect are the

22  "normal minimum requirement for a related action."

23  Citing matter of Plunkett, 82 F.3d 738 at 742.  Even

24  if the late action is excused under an excusable

25  neglect analysis, leave to amend may still be

14

1   inappropriate if the tardiness caused prejudice to
2   other parties or increased the cost of administering
3   the estate.   Id.
4                   Indeed, "Late filed claims, especially
5   in the bankruptcy context, disrupt orderly discharge
6   and should generally be barred."   Citing Expeditors
7   International of Washington, Inc., v. Kmart Corp.,
8   2004 Westlaw 868390, page 2.   Citing Plunkett, 82
9   F.3d at 741.
10                  The bar dates efficacy is helping
11  prompt resolution of disputes in bankruptcy and is
12  severely weakened if a creditor were allowed to amend
13  a claim "for any reason or no reason at all."   Citing
14  in re Stavriotis, 977 F.2d 1202 at 1206.   The
15  analysis the court employs in its discretion to
16  determine if reason exists to allow a post-bar date
17  amendment of a timely filed claim could be said to be
18  an amalgam of 15(c) standards and equitable
19  considerations unique to bankruptcy administration.
20  See Expeditors, 2004 Westlaw 868390 at page 2.
21                  "The parties disagree on what to call
22  the analysis of whether to allow a post-bar date
23  amendment of a timely filed claim, the Unroe test or
24  the 'excusable neglect test'.   The label does not
25  matter, though, because the analysis is ultimately

15

1   the same."

2          The analysis, "is not really a bright

3   line test, but an equitable determination involving

4   several factors, notice to the debtor, prejudice to

5   the debtor and other creditors, the length of the

6   delay and its potential impact on judicial

7   proceedings, including the cost of administering the

8   estate, the reason for the delay and the good faith

9   of the movant."  Id.  Citing Unroe, 937 F.2d at 349

10  through 51.  Plunkett, 82 F.3d at 741 and 42, and

11  Pioneer Investment Services Company v. Brunswick

12  Associates Limited Partnership, 507 U.S. 380, 395,

13  113 Supreme Court 1489, 123 L.Ed.2d 74.

14          The Seventh Circuit describes the

15  different concepts of notice in the Rule 15(c)

16  context and the equitable context.  "A key component

17  of a permissible equitable amendment is the debtor's

18  knowledge, whereas a Federal Rule of Civil Procedure

19  15(c) amendment focuses on the nexus between the

20  original claim and the amendment.  Citing Unroe, 937

21  F.2d at 350.

22          The prejudice that the court looks at

23  is not the prejudice to other creditors from the

24  dilution of the estate caused by the amended claim if

25  it is allowed.  Citing Expeditors, 2004 Westlaw

16

1   868390, pages 2 and 3; citing in re Stoecker, 5 F.3d

2   1022 at 1028.   Rather, the court examines whether

3   anyone was mislead or otherwise harmed by the filing

4   of the original claim.   Id.

5             Here the amended claim may not meet

6   the Rule 15(c) nexus test to relate back, as the

7   facts relating to the breaches of exclusivity and

8   confidentiality breaches are different than those

9   relating to the breach caused by rejection.   On the

10  other hand, the amended claim does not go "well

11  beyond the scope" of the original proof of claim."

12  See in re Gaslight, 167 B.R., 507 at 518 where the

13  court was considering whether to allow leave to amend

14  an adversary complaint under Rule 15(c).

15            In any event, the amended claim does

16  not -- strike that.   In any event, the amended claim

17  does meet the notice requirement in the equitable

18  context.   Kmart gained knowledge of FLOORgraphics'

19  contention that Kmart breached the meeting provision

20  and exclusivity provision in the proceedings on the

21  rejection motion.   See FLOORgraphics' Exhibit I to

22  response, pages 5 and 7.

23            From the materials provided by

24  FLOORgraphics in the context of this motion, there

25  was no discussion of a possible breach of the

17

1   confidentiality provision at least during the

2   proceedings on the rejection motion.  However, Kmart

3   knew that FLOORgraphics had grave concerns about

4   Kmart's negotiations with the party that Kmart chose

5   as a replacement flooring advertiser during the

6   pendency of an agreement that contained a

7   confidentiality provision.

8            Kmart contends that it and the court

9   were misled by FLOORgraphics only asserting damages

10  for the breach caused by the rejection.  Kmart argues

11  that, "it has shaped its case for these many years

12  based on FLOORgraphics' representation that it sought

13  only rejection damages."  However, the discovery

14  deadline has not passed in this matter, and

15  FLOORgraphics reports that discovery on the

16  confidentiality slash exclusivity breaches was

17  proceeding prior to the stay on discovery.

18            Moreover, there is no allegation that

19  any creditors in Kmart's estate were harmed or misled

20  by the original FLOORgraphics claim.  It is unlikely

21  that the creditors are unfairly surprised by an

22  amendment for damages that according to FLOORgraphics

23  could amount to $26 million when the originally --

24  when the originally filed claim asserted damages at

25  more than twice that amount.  Compare Stavriotis, 977

18

1   F.2d at 1205, noting that creditors had no reason to

2   believe that the IRS, who originally filed a claim

3   for $11,000, would attempt to amend the claim to

4   increase it to $2 million.

5           FLOORgraphics' request to amend was

6   made on March 24, 2006, approximately four years

7   after the date it timely filed its original claim.

8   Granted, that is a long time, but there was no

9   express outside date for when the length of delay

10  would be so long as to effectively swamp the other

11  equitable factors.  In re Plunkett, the Seventh

12  Circuit noted that a decade is a long time even in a

13  complex reorganization.  82 F.3d at 741.  "A decade's

14  lassitude is unpardonable."  Id. at 742.

15          The creditor's delay in that case was

16  particularly unforgivable.  It sent a letter to the

17  court, as opposed to a "simple one-page claim", moved

18  from its offices without advising of its new address

19  for notice, and then slept on its rights so as to

20  abandon them, only to seek leave to amend the "claim"

21  a decade later, after the parties dickered over a

22  plan of reorganization premised on pro rata

23  distribution of avoidance recoveries.

24          Here, FLOORgraphics timely filed a

25  proof of claim, accompanied by a copy of the

19

1   agreement, an affidavit and an expert's lengthy

2   report as to the damages.  FLOORgraphics opposed

3   rejection of the agreement, participated in a hearing

4   on the same, responded to the claim objection,

5   participated in discovery, attempted mediation,

6   responded to the initial summary judgment motion and

7   filed an objection to the plan.  The court cannot say

8   that FLOORgraphics behaved like the "Somnus" in the

9   Plunkett case.

10              Kmart does not discuss whether giving

11  leave to amend the claim will potentially impact the

12  administration of its bankruptcy case.  In a recent

13  omnibus hearing, Kmart has advised that there are,

14  "less than 100" disputed class five claims yet to be

15  resolved in this case, many of which have not even

16  been scheduled for hearing.  Kmart recently asked the

17  court to set omnibus hearings well into April of

18  2006.

19              Under the circumstances, it is likely

20  that giving FLOORgraphics leave to amend will not

21  unduly protract this case.  There is, likewise, no

22  discussion as to the impact on the costs of

23  administrating the estate.  Kmart concedes it will

24  have to go to trial as to the damages determination.

25              There is no indication or assertion of

20

1  fraud on the part of FLOORgraphics.  FLOORgraphics'

2  good faith is questioned only as to the length of the

3  delay; that is, its deleteriousness and an argument

4  that it purportedly added the breaches to the claim

5  in an effort to defeat summary judgment.

6           FLOORgraphics should not be faulted

7  for attempting to defeat summary judgment.

8  FLOORgraphics pins the reason for the delay in

9  seeking leave to amend on its understanding that its

10 original proof of claim encompassed all its claims

11 against the estate.  According to FLOORgraphics, when

12 it filed the original claim, it was putting an

13 outside figure on what it estimated its lost profits

14 to be from breach of the agreement.

15          Counsel for FLOORgraphics said at oral

16 argument in so many words that when FLOORgraphics

17 filed its original claim, it was asserting its intent

18 to hold the estate liable for Kmart's ongoing

19 repudiation of the agreement whether in the form of

20 leaking confidential information, breaching the

21 exclusivity provision or rejecting the agreement

22 pursuant to provisions of the Bankruptcy Code.

23          Although the reason for the delay may

24 not be as persuasive as in other circumstances, the

25 court is mindful that the proof of claim is a "simple

21

1   one-page form," that may not, like a complaint does,

2   easily lend itself to providing disclosure of all

3   possible grounds for damages.

4           In any event, the Seventh Circuit has

5   yet to rule that the fault in the delay is a

6   pre-eminent factor in the excusable neglect analysis.

7   See in re Kmart Corp., Appeal of Wilhemina Simmons,

8   381, F.3d 709 at 715.

9           Under all of the circumstances present

10  here, the court will give FGI leave to amend its

11  claim.  Kmart's motion for dismissal, summary

12  judgment or in limine ruling, which is premised on a

13  ruling not giving FLOORgraphics leave to amend, is

14  denied.

15          As noted, the ruling on FLOORgraphics'

16  motion to reconsider the court's previous in limine

17  ruling will be deferred until trial.  Pursuant to

18  Bankruptcy Rule 7056(d), the material facts that

19  FLOORgraphics admitted in response to Kmart's

20  statement of material facts are established for

21  trial.

22          Counsel for FLOORgraphics, will you

23  please give me a minute order for reasons cited on

24  the record entering the relief entered.

25          MR. FISHER:  I will, Your Honor.  I

22

1   will send it over later this afternoon.

2               THE COURT:  All right.  What I'm going

3   to do now is release the stay on discovery.  How long

4   is discovery going to take?  I would like to set a

5   discovery deadline.

6               MR. GEARY:  Can I have a minute to

7   confer with counsel?

8               THE COURT:  Okay.

9               MR. GEARY:  Well, Your Honor, we

10  believe that 150 days from today approximately.  I

11  don't know --

12              MR. FISHER:  The end of April, Your

13  Honor.

14              MR. GEARY:  That will be fine.

15              MR. FISHER:  He is quicker on those

16  numbers.

17              THE COURT:  I will set a discovery

18  cutoff of April 30th -- would you give me a separate

19  order -- 2007.

20              MR. FISHER:  A separate order.

21              THE COURT:  And I will set a status on

22  this matter then for May.

23              THE CLERK:  May 16.  It is a Wednesday

24  at 10:30.

25              THE COURT:  10:30.  All right.  I also

23

1   have continued to track this matter, I am sure, the

2   motion of Kmart pursuant to 502 to estimate the

3   claim.   What do you want to do with that?

4                MR. GOLDMAN:  Your Honor --

5                THE COURT:  I'm sorry, Mr. Goldman.

6   Can you hear me?

7                MR. GOLDMAN:  Yes, I can, Your Honor.

8                THE COURT:  Thank you.

9                MR. GOLDMAN:  This is Andy Goldman.

10  Our strong preference would be to have the court

11  entertain this at the next available date, if not

12  sooner.  Again, from our perspective, as we've laid

13  out in the pleadings, we don't believe that anything

14  that is happening with respect to sort of the main

15  event between FLOORgraphics and Kmart ultimately

16  impacts in any material way our request to simply

17  lower the amount in the class five distribution

18  reserve of stock for the FLOORgraphics claim extant

19  to our obligation to make FLOORgraphics whole in cash

20  to the extent that they ultimately are allowed a

21  claim by the court in an amount above which we have

22  reserved for them in stock.

23               So that issue from Kmart's perspective

24  is wholly apart from the issues underlying the merits

25  of the claim and whether or not they will be allowed

24

1    a claim in the amount of zero dollars or $59 million

2    or some amount in between.

3                Again, Your Honor, as we said in the

4    motion, the sooner we can get the court's guidance on

5    this, the sooner we will know whether or not we can

6    release what is the single largest chunk of stock

7    held back in the class five reserve that we are

8    required to reserve in full unless we can estimate

9    downwards from that amount.  The other holders of the

10   allowed five claims, class five claims, who -- I

11   think this would enure to their benefit.

12               THE COURT:  All right.  Mr. Fisher,

13   would you step to the microphone, please.  I do

14   believe the next omnibus hearing in Kmart is

15   January 17th.

16               MR. FISHER:  Yes.

17               THE COURT:  Do you want to respond to

18   this motion in writing?  What do you want to do?

19               MR. FISHER:  Yes, I would like to file

20   a paper in response.

21               THE COURT:  All right.  How much time

22   would you like to respond?

23               MR. FISHER:  Two weeks.

24               THE COURT:  All right.  Fourteen days

25   to respond.

25

1          Would you like time to reply, Mr.

2  Goldman?

3          MR. GOLDMAN:  We would, Your Honor.

4          THE COURT:  I'm sorry?

5          MR. GOLDMAN:  We would, Your Honor.

6          THE COURT:  How much time?

7          MR. GOLDMAN:  Perhaps a week after the

8  response -- any response that's filed.

9          MR. GEARY:  Your Honor, just, if I

10  may, those two days are the day after Christmas and

11  the day after New Year's.  They might be inconvenient

12  times.

13          MR. FISHER:  Yes.

14          THE COURT:  Thank you for bringing

15  that to our attention.

16          MR. FISHER:  We ought to pick, I

17  think, a different -- Your Honor, what about giving

18  us -- I'll be working during that period of time.

19  What about the 28th?  Is that the Friday?

20          THE COURT:  December 29th is Friday.

21          MR. FISHER:  Why don't we do it on the

22  29th, Your Honor.

23          THE COURT:  12-29 for a response, and

24  do you want to file your reply then by January 5?

25          MR. GOLDMAN:  If we could, Your Honor,

26

1   just because that's a short week because of the

2   Monday holiday, if the court would indulge us to

3   January 8th, that following Monday.

4                    THE COURT:  I'll tell you what, you

5   can go over until the 12th.

6                    MR. GOLDMAN:  Okay.

7                    THE COURT:  January 12th for reply.

8   And then status on January 17th at 10:00 o'clock.

9                    Mr. Fisher, would you put that in an

10  order or would someone put that in a minute order

11  also.

12                   MR. FISHER:  Yes, I will, Your Honor.

13  Should that be a separate minute order also on that

14  motion?

15                   THE COURT:  Yes.

16                   MR. FISHER:  Okay.  So there will be

17  three orders you will want?

18                   THE COURT:  That's correct.

19                   MR. FISHER:  Okay.

20                   MR. GOLDMAN:  Your Honor, just for

21  clarification, that would be on for status or at that

22  point for argument?

23                   THE COURT:  Let's put it on for

24  status.  I would like to take a look at it, and then

25  I can give you a short date thereafter for argument.

27

1              MR. GOLDMAN:  Very well.

2              MR. FISHER:  Your Honor, was that at

3  11:00 o'clock you said?

4              THE COURT:  10:00 o'clock.

5              MR. FISHER:  10:00 o'clock.

6              THE COURT:  You will have access to

7  the agenda, and Kmart puts the agenda together.  So

8  it will give you guidance as to when it will be

9  called.

10              MR. FISHER:  Thank you, Your Honor.

11              THE COURT:  Thank you.

12              MR. GOLDMAN:  Thank you, Your Honor.

13              (Which were all the proceedings had in

14              the above-entitled cause, December 12,

15              2006, 2:00 p.m.)

16  I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
   THAT THE FOREGOING IS A TRUE AND ACCURATE
17  TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
   ENTITLED CAUSE.

18

19

20

21

22

23

24

25